DECISION
Brian Sullivan ("Sullivan" or "Plaintiff") brings this appeal from a decision of the Retirement Board of the Employees' Retirement System of Rhode Island ("Board"), which found that he was not eligible to purchase service retirement credits pursuant to G.L. 1956 § 36-9-26. This Court has jurisdiction over the appeal pursuant to G.L. 1956 § 42-35-15. For the reasons set forth below, this Court reverses the decision of the Board. *Page 2 
 I Facts and Travel
This case involves the proverbial Hobson's choice.[1]
In 1983, Sullivan, a full-time teacher for the Newport School Department, received notice that he was being laid off from his teaching position for the following year for financial reasons. Later, he was offered an option, to return, but only on a part-time basis. His Hobson's choice was to return part-time or to accept the total layoff. Just as a glass that is half full also is half empty, the fact that Sullivan, a full-time teacher, was invited to work only on a part-time basis essentially means that he also was laid off on a part-time basis.
However, what Sullivan did not realize was that his choice would end up penalizing him when he sought to retire. Had Sullivan refused the offer of part-time employment and stayed out of work, or had he obtained alternate unrelated employment during that school year, he could have purchased retirement credits after he returned to full-time teaching and been eligible to retire at the same time as if he never had been laid off. Conversely, by accepting the offer and providing part-time service to the school department, the Board claims that he sacrificed his right to purchase additional credits and retire with his class; namely, those who entered teaching at the beginning of the 1981-1982 school year. This Court finds that the Board's decision achieves an absurd result by denying him an opportunity to purchase credits that would have been available to him had he declined the part-time job offer.
The material facts in this case are not in dispute. Sullivan began working as a full-time teacher for the Newport School Department in the 1981-1982 school year. (Admin. Hearing Tr., August 19, 2009, at 25:16-24.) The Plaintiff testified that in February 1983, he received a letter *Page 3 
from the Superintendent of Schools advising him that he would be laid off for the 1983-1984 school year. Id. at 26:4-15. However, several months before the start of that school year, Sullivan was notified that he would be recalled, but only on a part-time basis. Id. at 27:21-23. During the 1983-1984 school term, Sullivan made contributions to the Employees Retirement System of Rhode Island ("ERSRI") at a pro-rata rate based upon his part-time status, calculated at sixty-nine percent of the full-time rate. Id. at 48:10-12; 56:19-23. Sullivan returned to full-time employment for the 1984-1985 school year, and at all times material hereto, he continued to teach on a full-time basis.Id. at 29:10-15.
In early 2009, Sullivan submitted a request to purchase layoff credit pursuant to § 36-9-26 for his partial layoff during the 1983-1984 school year.[2] ERSRI denied that request. Sullivan appealed the decision, ultimately requesting and receiving a hearing before an administrative hearing officer.
Sullivan interpreted the term layoff to include his part-time employment during the 1983-1984 school year. He claimed that he was partially laid off and did not return to "active membership" until he resumed full-time employment in September 1984. For its part, ERSRI claimed that Sullivan never relinquished his active status in spite of working less than full time during the 1983-1984 school year. ERSRI disputed the contention that Sullivan suffered a partial layoff qualifying him to purchase retirement credits.
The hearing officer rendered his decision on November 5, 2009, denying Sullivan's appeal. The hearing officer rejected Sullivan's contention that he was partially laid off during the 1983-1984 school year and thereby entitled to purchase retirement credits under § 36-9-26. *Page 4 
Instead, the hearing officer found that Sullivan was not laid off because he never relinquished his active status in spite of working less than full time during the 1983-1984 school year. In so ruling, the hearing officer concluded that the plain and ordinary meaning of the term "layoff" did not encompass a reduction in hours. (Decision of Hearing Officer, November 5, 2009.)
On December 9, 2009, the Board affirmed the decision of the hearing officer. From that decision, Sullivan took a timely appeal to the Superior Court.
 II Standard of Review
The Court reviews a contested administrative decision pursuant to the Administrative Procedures Act, § 42-35-15(g). This section provides that:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Sec. 42-35-15(g).
In reviewing an agency's decision, this Court may not substitute its judgment for that of the agency on questions of fact.See Johnston Ambulatory Surgical Assoc.,Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000). Accordingly, such review of an administrative decision is "limited to an examination of the certified record to determine if there is any legally competent evidence therein to support the agency's decision."Id. (quoting Barrington Sch. Comm. v. Rhode Island StateLabor Relations Bd., 608 A.2d 1126, 1138 (R.I. 1992)). "Legally competent evidence is *Page 5 
relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." Town of Burrillville v. Rhode IslandState Labor Relations Bd., 921 A.2d 113, 118 (R.I. 2007). However, "[q]uestions of law determined by the administrative agency are not binding upon [the Court] and may be freely reviewed to determine the relevant law and its applicability to the facts presented in the record." Dep't of Envt'l Mgmt. v. Labor Rels.Bd., 799 A.2d 274, 277 (R.I. 2002) (citing Carmody v. RhodeIsland Conflict of Interest Commission,509 A.2d 453, 458 (R.I. 1986)).
However, "[a]lthough this Court affords the factual findings of an administrative agency great deference, questions of law — including statutory interpretation — are reviewed de novo."Heritage Healthcare Services, Inc. v. Marques,14 A.3d 932, 936 (R.I. 2011) (quoting Iselin v. Retirement Boardof the Employees' Retirement System of Rhode Island,943 A.2d 1045, 1049 (R.I. 2008)). It is axiomatic, however, that while a court of review addresses questions of statutory interpretation on a de novo basis, it is a "well-recognized doctrine of administrative law that deference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency . . . even when the agency's interpretation is not the only permissible interpretation that could be applied." Auto BodyAss'n of Rhode Island v. State Dept. of Business Regulation,996 A.2d 91, 97 (R.I. 2010) (quoting Pawtucket Power AssociatesLimited Partnership v. City of Pawtucket,622 A.2d 452, 456-57 (R.I. 1993)). Notwithstanding this deference, however, the Court always remains "the final arbiter of questions of statutory construction." Rossi v. Employees' RetirementSystem, 895 A.2d 106, 113 (R.I. 2006). *Page 6 
 III Analysis
Chapter 9 of title 36 of Rhode Island General Laws governs membership and service credits for public officers and employees' contributions to the Retirement System. Public school teachers are among those that are covered by the statutory scheme. At issue in this case is a dispute over the meaning of § 36-9-26, entitled Credits for layoffs.
Recently, our Supreme Court succinctly stated that when interpreting a statute,
 "our ultimate goal is to give effect to the General Assembly's intent. We have further stated that [t]he plain statutory language is the best indicator of legislative intent. And we have indicated that "a clear and unambiguous statute will be literally construed. Accordingly, when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." DeMarco v. Travelers Ins. Co., No. 2008-334-Appeal, slip op. at 53 (R.I., filed July 12, 2011) (internal citations and quotations omitted).
However, "[t]he plain meaning approach" does not constitute "the equivalent of myopic literalism, and it is entirely proper for [the Court] to look to the sense and meaning fairly deducible from the context." Generation Realty, LLC v. Catanzaro,21 A.3d 253, 259 (R.I. 2011) (quoting In re Brown,903 A.2d 147, 150 (R.I. 2006)) (internal quotations omitted). Accordingly, a literal interpretation should not be applied even where a statute is clear and unambiguous, "when such a construction will lead to a result at odds with the legislative intent."Sugarman v. Lewis, 488 A.2d 709, 711 (R.I. 1985) (citingCarrillo v. Rohrer, 448 A.2d 1282, 1284 (R.I. 1982);Kingsley v. Miller,120 R.I. 372, 376, 388 A.2d 357, 360 (1978)); seealso Kachanis v. Board of Review, Dept. of Employment andTraining, 638 A.2d 553, 557 (R.I. 1994) (stating that clear and unambiguous statutes are "subject to literal interpretation, provided such an interpretation is consistent with the legislative intent underlying the enactment[]"). *Page 7 
This Court should "consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections." Generation Realty, LLC,21 A.3d at 259 (quoting Sorenson v. Colibri Corp.,650 A.2d 125, 128 (R.I. 1994)). Accordingly, this Court should not allow itself "to be blindly enslaved to the literal reading of statutes when to do so would defeat or frustrate the evident intendment of the legislature." Sugarman,488 A.2d at 711 (quoting Town of Scituate v. O'Rourke,103 R.I. 499, 507, 239 A.2d 176, 181 (1968)). Furthermore, "under no circumstances [should] this Court `construe a statute to reach an absurd result.'" Generation Realty, LLC,21 A.3d at 259 (quoting Kaya v. Partington,681 A.2d 256, 261 (R.I. 1996)).
Section 36-9-26 permits Retirement System members to purchase retirement credits after they return to work from having been being laid off. It provides in pertinent part:
 "Members who are laid off for any reason and are not on leave without pay may purchase up to one years' [sic] credit for retirement purposes; provided the member did not withdraw his or her retirement contributions while on layoff, and returns to active membership; provided, further, that the member purchases that credit upon his or her return to service from the layoff and pays into the retirement system the full actuarial cost as defined in subsection 36-8-1(9)." Sec. 36-9-26(a).
Sullivan asserts that § 36-9-26 clearly and unambiguously provides for purchase of credits in circumstances where there has been a "partial layoff," so-called. He further contends that even if the statute is not ambiguous, the hearing officer's interpretation of the terms "laid off" and "active membership," as applied to the facts in this case, produced an absurd result in light of the overall purpose of the statute, which is to allow Retirement System members to purchase retirement credits. It is undisputed that Sullivan was employed as a teacher on a part-time basis during the 1983-1984 school year. According to Sullivan, § 36-9-26 does not requires *Page 8 
that a member be completely laid off in order to qualify for the purchase of retirement credits and that it does not prohibit the purchase credits for partial lay offs.
ERSRI counters that § 36-9-26 clearly and unambiguously limits the purchase of credits only to those persons who actually have experienced an interruption in active membership of the Retirement System. It then points out that even though Sullivan worked less than full time during the 1983-1984 school year, at all relevant times he remained employed and was an active and participating member of the Retirement System. Consequently, it avers that Sullivan was never "laid off" for purposes of the statute because before he could have returned to active service and purchased retirement credits, there must be an actual cessation or gap in his employment and contributions to the Retirement System. ERSRI additionally declares that while the General Assembly could have included language expressly permitting members to purchase credits in the case of a partial layoff, it did not to do so; consequently, it maintains that the hearing officer did not err when he refused to interpret the statute as permitting a credit purchase for an alleged partial layoff.
Chapter 8 of title 36 of the Rhode Island General Laws, entitled Retirement System — Administration, defines certain terms employed in chapters 8 to 10 of title 36, "unless a different meaning is plainly required by the context. . . ." Sec. 36-8-1. According to that section, an "`[i]nactive member' shall mean a member who has withdrawn from service as an employee but who has not received a refund of contributions." Sec. 36-8-1(10). Section 36-8-1(19) defines an active member as "any employee of the state of Rhode Island as defined in this section for whom the retirement system is currently receiving regular contributions. . . ."
Our Supreme Court has stated that the term "lay off" generally means "to cease to employ [a worker] usu[ally] temporarily because of slack in production. . . ." Formisano v. *Page 9 Blue Cross of Rhode Island, 478 A.2d 167, 169 (R.I. 1984) (quoting Webster's Third New InternationalDictionary at 1281 (1971)). Thus, a lay off constitutes a "temporary cessation of employment with an expectation of eventual return." Formisano 478 A.2d at 169 (quoting Conner v.Phoenix Steel Corp., 249 A.2d 866, 869 (Del. 1969)). Put another way, a lay off constitutes "a temporary dismissal by the employer which anticipates reemployment and therefore is distinguished from unemployment by reason of discharge, resignation or other permanent termination." Formisano 478 A.2d at 169 (quoting GeneralMotors Corp. v. Erves, 249 N.W.2d 41, 46 (Mich. 1976)). The distinguishing feature between a "partial layoff" and a "total layoff" is that in the former situation, the employee receives some pay from an employer; whereas, in the latter situation, the employee receives no pay. See Department of Navy, Naval UnderwaterSystems Center v. Federal Labor Relations Authority,854 F.2d 1, 4-5 (1st Cir. 1988).
In the instant matter, it is clear from the record that other than the recess between the two academic terms in question, Sullivan did not experience a period where he received no pay. Furthermore, it is undisputed that he continued to pay into the Retirement System, albeit on a reduced pro-rata basis. Consequently, considering the Retirement System received regular contributions at all pertinent times, Sullivan's active membership continued uninterrupted. Furthermore, had Sullivan applied for unemployment compensation during the summer recess while intending to return on a part-time basis, he would not have been qualified to collect that compensation because he would not have been considered laid off for purposes of such benefits.
In Elias-Clavett v. Board of Review,15 A.2d 1008 (R.I. 2011), our Supreme Court recently addressed unemployment compensation eligibility for teachers. There, the plaintiff was a per-diem substitute teacher who filed an unemployment compensation claim at the end of an *Page 10 
academic year despite the fact that her employer-school had notified her that she had a "reasonable assurance" of "return in the same capacity as a substitute teacher for the [upcoming] academic year. . . ." Elias-Clavett, 15 A.2d at 1010.[3] The Court held that "in the absence of bad faith," coupled with "the lack of specific allegations or facts that undermine[d] the sincerity of the [reasonable assurance] letter," the plaintiff did not demonstrate that she was entitled to unemployment benefits during summer recess because she had been "provided with reasonable assurance as defined by § 28-44-68(a)." Id. at 1015.
However, with respect to claims for unemployment compensation for reasons other than a lay off, "an individual who leaves work voluntarily with good cause is eligible for . . . unemployment compensation benefits." Rocky Hill School, Inc., v. StateDepartment of Employment and Training, Board of Review,668 A.2d 1241, 1243 (R.I. 1995). Consequently, the "`public interest demands of [the] court an interpretation sufficiently liberal to permit the benefits of the act to be made available to employees who in good faith voluntarily leave their employment because the conditions thereof are such that continued exposure thereto' would cause or aggravate nervous reactions or otherwise produce psychological trauma." Id. (quoting Harraka v. Board ofReview of Department of Employment Security,98 R.I. 197, 200 A.2d 595 (1964)). Accordingly, "[a]n employee is deemed to leave for good cause when the employee is faced with sufficiently adverse circumstances that are beyond that employee's control." Kane v. Women and Infants Hospital of RhodeIsland, 592 A.2d 137, 138 (R.I. 1991). *Page 11 
"As a general rule, a substantial pay reduction gives an employee good cause for quitting." Dehmel v. Employment Appeal Board,433 N.W.2d 700, 703 (Iowa 1988); see also KeystoneSteel Wire Division, Keystone Consolidated Industries v. IllinoisDept. of Labor, 346 N.E.2d 399, 401 (Ill. App. 1976) (observing that "a substantial reduction in wages can be `good cause' for leaving employment, depending upon the attendant circumstances");Bunny's Waffle Shop v. California Employment Commission,151 P.2d 224, 227 (Cal. 1944) ("A substantial reduction in earnings is generally regarded as good cause for leaving employment.").
In Dehmel, the claimant suffered a reduction in hours of between twenty-five to thirty-five percent per week "due to economic conditions which were beyond the control of the employer."Dehmel, 433 N.W.2d at 703. The Iowa Supreme Court concluded that, for purposes of qualifying for unemployment benefits, such a reduction in hours was substantial as a matter of law. Id. In reaching this conclusion, the court reviewed similar conclusions of a substantial decrease from other jurisdictions. SeeTombigbee Lightweight Aggregate Corp. v. Roberts,351 So.2d 1388, 1389 (Ala. Civ. App. 1977) (reduction in ten hours per week of guaranteed overtime was substantial); Bunny's WaffleShop, Inc., 151 P.2d at 228 (twenty-five percent reduction in pay constituted good cause to leave employment); Morysville BodyWorks Inc. v. Commonwealth, 430 A.2d 376, 377 (Pa. 1981) (same);Sunstar Foods, Inc. v. Uhlendorf,310 N.W.2d 80, 84 (Minn. 1981) (same for a twenty-one to twenty-six reduction in wages); Danielson Mobil, Inc. v. Johnson,394 N.W.2d 251, 253 (Minn. App. 1986) (elimination of overtime resulting in a nineteen percent reduction in pay was good cause).
In the instant matter, Sullivan received notice in February 1983 informing him that he was being laid off for the 1983-84 school year due to economic reasons. Thereafter, for the same budgetary reasons, he was notified that he instead could return only on a part-time basis *Page 12 
with a concomitant reduction in pay. Sullivan chose to return to work at that reduced rate of pay. His pro-rata contributions to the Retirement System amounted to sixty-nine percent of his former contributions — in other words, a thirty-one percent decrease in the rate he previously had contributed to the system.
It is undisputed that had the school not extended the offer of part-time employment for the 1983-84 academic year, and that had Sullivan returned to full-time teaching in a later academic year, then he would have been eligible to purchase retirement credits for the 1983-84 academic year. Likewise, had Sullivan chosen not to accept the offer of part-time employment for the 1983-84 academic year, he would have been eligible to purchase retirement credits for that year. Indeed, considering that the offer of part-time employment resulted in a substantial reduction in pay, it is conceivable that had Sullivan refused the offer, such refusal may have been considered good cause for purposes of collecting subsequent unemployment benefits.
It is clear to the Court that the underlying purpose of chapter 9 of title 36 is to allow those who have been laid off to purchase retirement credits after resuming service within the Retirement System. The idea — that one member could refuse an offer of part-time employment, perhaps even qualify to collect unemployment compensation in the interim, and then later be qualified to purchase retirement credits, while another member could be precluded from purchasing retirement credits because he/she chose to accept an offer of part-time employment — leads to an absurd result and thwarts the spirit of the law. Consequently, the Court concludes that the hearing officer's conclusion that Sullivan could not purchase the disputed retirement credits is affected by error of law and clearly erroneous. *Page 13 
 IV Conclusion
After a review of the entire record, the Court concludes that the Board's decision was affected by error of law and clearly erroneous. Sullivan's substantial rights have been prejudiced. Accordingly, this Court reverses the Board's decision denying Sullivan's request to purchase credits for retirement purposes.
Counsel shall submit the appropriate judgment for entry.
[1] Thomas Hobson lived during the late 16th and early 17th centuries. He owned a large stable and hired out horses, offering his customers a choice of any horse they wanted so long as they took the one that was located in the stall nearest the door or take none at all. His ultimatum became known as Hobson's choice.
[2] If Plaintiff is able to purchase those credits, he would have twenty-eight years of service by September 30, 2009. Those who have accumulated twenty-eight years of service by that date may retire without regard to their age. If he is unable to purchase said credits, determination of his eligibility to retire would be calculated based upon a different formula, and he would not be able to retire based solely on years of service. See
G.L. 1956 § 16-16-12.
[3] Teachers may not receive unemployment benefits between successive academic years "if there is a contract or a reasonable assurance that such individual will perform services in any such capacity for any educational institution in the second of those academic years or terms." Sec. 28-44-68(1). "Reasonable assurance" is defined as
 "a written agreement by the employer that the employee will perform services in the same or similar capacity during the ensuing academic year, term or remainder of a term. Further, reasonable assurance would not exist if the economic terms and conditions of the position offered in the ensuing academic period are substantially less than the terms and conditions of the position in the first period." Sec. 28-44-68(a). *Page 1